IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| **STEVEN LAPIER** \* | |
|     Plaintiff | |
| v. | Civil Action No: 8:10-cv-02851 |
| **PRINCE GEORGE'S COUNTY, MARYLAND** \* | |
| and | |
| \* | |
| **ROBERTO L. HYLTON, CHIEF OF POLICE** | |
| **DEFENDANTS** | |
| \* | |

\*    \*    \*    \*    \*    \*    \*

## FIRST AMENDED COMPLAINT

Now comes the Plaintiff, Steven LaPier, by and through this attorneys, John M. Singleton and The Singleton Law Group and brings this action against Prince George's County, Maryland, and Roberto Hylton, Chief of Police, individually, and alleges violations of 42 USC, § 1983 for terminating the Plaintiff in order to prevent him from or for exercising his First Amendment Rights of Free Speech; for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* (herein "Rehab Act"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq.* (herein "ADA"); and the ADA Amendments Act of 2008 ("ADAAA. As grounds therefore, Plaintiff states as follows:

### PARTIES

1. Plaintiff, Steven LaPier (hereinafter referred to, as "Plaintiff" or "LaPier") is Caucasian male, who at all pertinent times resided in Prince George's County, Maryland.

2. At all pertinent times in this Complaint, Plaintiff was a cadet with the Prince George's County Police Department.

3. Prince George's County (hereinafter referred to as "the County") is a charter form of municipality in accordance with Maryland State Law and is tasked with providing County citizens with services and facilities.

4. Roberto L. Hylton (hereinafter referred to as "Hylton") was the Chief of the Prince George's County Police Department (herein "the Department"), charged with overseeing every aspect of the Department's management.

## JURISDICTION

5. This Court has subject matter jurisdiction pursuant to 42 U.S.C.§1983 for the First Amendment Claim, the American With Disabilities Act, the Americans With Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S C. § 12111 et seq., the Rehabilitation Act, 29 U.S.C.§ 701 et seq. under Federal Question jurisdiction.

6. Plaintiff filed charges with United States Equal Employment Opportunity Commission on January 7, 2010 alleging that the County and the Department engaged in unlawful acts of retaliation, age discrimination and disability discrimination. By letter dated November 30, 2010 from the United States Department of Justice, Civil Rights Division and by letter dated December 210, 2010, Plaintiff was provided "Right to Sue" notices from both federal agencies allowing LaPier the right to institute private civil action to enforce his rights under the ADA. (Attached hereto as Exhibit "A").

## FACTS COMMON TO ALL COUNTS

7. Plaintiff began training as a full-time Student Officer in the Department on or about October 28, 2008 after he had been notified by the Department on September 20, 2008 that he had been selected for appointment to the upcoming Police training academy.

8. The County receives federal funding relating to the employment of handicapped and disabled individuals. As such, the P.G. County personnel policies specifically state that the "Government does not discriminate on the basis of disability in the admission or access to, or treatment of, or employment in, its programs, activities or services and encourages the involvement and participation of individuals with disabilities."

9. Plaintiff accepted the offer of employment with the department by executing an Employment Acceptance Letter dated October 13, 2008 and a Police Officer Training and Service Agreement on October 13, 2008. Plaintiff agreed to a specified training period beginning October 7, 2008 and ending June 4, 2009 and a specified required service obligation period beginning October 27, 2008 and ending June 2011.

10. LaPier attended training session class 115 of classes that are consecutively chronologically numbered. Training sessions were normally supposed to take six months although class 115 lasted almost 9 months taking from October 2008 through June 2009. Plaintiff was considerably older than most of the other 41 recruits in his class who were in their 20's.

11. From the beginning of training academy, LaPier would talk often with a friend, Major David Morris ("Morris") of the Department. Morris had knowledge of the training requirements, having had been the commanding officer at the Academy prior to LaPier beginning his training. LaPier had taught Morris's son, David for three to four years in mixed martial arts skills at the karate school that he owned and operated. Both LaPier and Morris had remained friends since that time.

12. From the very first day of the Academy, Plaintiff observed what he considered inappropriate and unprofessional conduct by the police instructors at the Academy. During orientation, Corporal Fowble instructed the class that no obscene or vulgar language would be tolerated and that if "anyone had any fucking problem with that"; they come to him "to report the fucking problem."

13. While LaPier expected that they would be trained in the various aspects of police work, he found himself folding clothes in a warehouse for almost two weeks during the beginning of training. The Equipment Division of the Department was housed next door to the Academy where uniforms were cleaned and kept. Because one of the instructors became angered at the manner clothes were folded, all 41 of the recruits spent several weeks with their only activity being the folding of these uniforms.

14. While still in the first few weeks of training, Major Sesker who at that time was in charge of the Academy became enraged with Student Officer Cumbo who had worn a sweatshirt with CPI (Academy) lettering on it to the local "Chipolte" restaurant. Another officer took a picture with his cell phone and showed it to the Major who then punched a hole through the wall to the astonishment of all of the Student Officers. Because LaPier was older and had a

broader range of skills than others, Sesker told LaPier to repair the hole using his own money to buy materials.

15. Student officers were subjected on a daily basis to degrading, demeaning and dehumanizing treatment by the instructors at the Academy. Morris was advised of the improprieties and told Plaintiff that he would discuss them with the appropriate personnel because "they should not be doing those things" but that it was probably better to "suck it up" and "stick it out," so as to avoid having LaPier personally complain exposing him to retaliation.

16. At some point during the winter months, both male and female student officers began being forced to undress and change into their uniforms in the middle of a public parking lot adjacent to the Academy after being told by their instructors that they are not "worthy" of using a locker room. When Corporal Weller became angered, he told LaPier, "I am going to fucking kill you." Other officers used similar language such as Corporal Miller always calling them "fucking retards," and Corporal Larson telling lots of recruits that he was going to "punch them in the throat." As before, LaPier would keep Morris aware of these things and it was clear to LaPier by Morris that these things were being transmitted to the appropriate personnel at the Department.

17. Defendants were provided a doctor's note from Dr. Harvinder Singh from the University of Maryland School of Medicine indicating that LaPier suffered various medical conditions all of which together or separately substantially limit life activities. The report states that LaPier suffered from multiple medical problems including osteoarthritis, migraine and restless leg syndrome, Osler-Weber-Rendu syndrome, history of spine surgeries and thrombocytopenia. In April 2009 after collapsing at the Academy, he presented with microcytic anemia with low hemoglobin and hematocrtit levels. (Letter attached hereto as Exhibit "B")

18. LaPier had suffered these bleeding events from the time that he was an adolescent. He had been treated with various modalities including cauterization of the blood vessels in his nose to prevent the frequency of nosebleeds. This loss of blood, if left untreated, will result in severe anemia causing among other things, the loss of the ability of the blood to maintain high oxygen levels necessary to maintain one's breath during even minimal exertion let alone the physical demands of the Police Academy training.

19. On or about April 9, 2010, Plaintiff passed out on during a routine training run, and was subsequently diagnosed with and treated for Osler Weber Rendu Syndrome, a hematologic

and genetic relating to the development of abnormal blood vessels called anteriovenous malformations (AVM) throughout the body that caused bleeding that can result in anemia. Plaintiff was advised by his doctors to perform only "light work" until his anemia was resolved. Said restriction was in place for one week, after which Plaintiff resumed his normal training routines.

20. Osler-Weber-Rendu syndrome is a long lasting disease that causes episodic bleeding resulting in decreased oxygen in the blood, heart failure, hepatomegaly, iron deficiency anemia or stroke depending upon where the AVM vessels are located. While bleeding may be episodic, the actual condition lasts more than 6 months. The disease may clearly substantially limit one's life activities depending upon the timing and duration of episodic bleeding. (See attached Exhibit "C")

21. By letter dated May 5, 2009, Plaintiff's physician, Dr. Harvinder Singh, advised the Department that he was fit to resume his training with the Department. Under the final regulations issued by the EEOC in March, 2011 under the ADAAA of 2008, episodic conditions are covered by the ADA if they substantially limit major life activities while active and the conditions lasting less than six months can be substantially limiting.

22. As already noted, LaPier kept Morris aware of the activities going on at the Academy and Morris had agree not to use LaPier's name as being associated with the complaints. As things progressively got worse, Morris told him, "Let me see what I can do." However, sometime around April, LaPier first noticed cheating going on. Morris told him that he would "probably have to put his name out there," given the growing seriousness of the allegations. From there on in, LaPier felt targeted and was getting into trouble for everything he did.

23. Ultimately, a day or so before LaPier was terminated, he became aware of massive cheating being carried out by instructors of the Academy. The effect of such cheating might render all recruits ineligible to obtain Maryland Police Training certification that is necessary to serve as a police officer at any department in Maryland. LaPier had observed Corporal Fowble ("Fowble") providing answers to the questions on test to the recruits. Fowble came into the class and said we are going to do these test "Enron style." He proceeded to state, "the answer to number one is "A", the answer to number two is…" and so on. LaPier

immediately notified Morris of this and Morris indicated that he would immediately bring it to the attention of the Chief.

24. Morris reported this clearly startling revelation to Chief Hylton that same day, June 17, 2009 prior to the Chief having sent the letter of termination to LaPier. Hylton instructed Morris to tell LaPier that he was ordered to put of all these allegations including those related to cheating in a written letter addressed to the Chief and to submit such letter to the Chief as soon as possible.[1] This occurred the day before LaPier was discharged although the letter did not get delivered until June 19, 2009. (A copy of this letter is attached hereto as Exhibit "D")

25. The County's Medical Advisory Board (hereinafter referred to as "MAB") reviewed Plaintiff's medical records at a meeting on June 4, 2009. Although the Board was in possession of the May 5, 2009 letter from Dr. Singh, they nonetheless found the Plaintiff unfit for duty and recommended his separation from the Academy. Further, the MAB did not order an independent medical exam, did not have a single doctor's report stating that LaPier was permanently unable to perform the essential elements of his position. The MAB did not offer or grant the Plaintiff to speak on his own behalf at this hearing.[2]

26. Plaintiff was advised of the recommendation of the MAB in a letter signed by Hylton, dated June 9, 2009 and delivered on June 18, 2009. The letter states in pertinent part, "After reviewing the medical records, the Medical Advisory Board recommended that you are permanently disabled and unfit for duty." As such, there is can be no dispute that LaPier was perceived to have a disability within the meaning of the ADA is finding him permanently unfit for duty. The letter expressed the County's intention to separate the Plaintiff "on a Separation Disability Action", pursuant to the provisions of Section 16-189 of Personnel Law for Prince George's County." The Plaintiff was given 10 days to contest the action. (Attached hereto as "Exhibit "E")

27. By letter dated June 18, 2009, Plaintiff contested the separation and provided yet another doctor's report stating that the Plaintiff was fit for duty. Plaintiff also appealed the

---

[1] LaPier testified at his deposition in a related case, *Vanessa Springer v. Prince George's County Maryland*, P.G. County Circuit Court, Case No. CAL -20498, "I was called back by Major Morris after he told Chief Hylton that this is what happened and Major Morris said, "Chief Hylton has ordered you to write a letter." And I asked him, I says, "Okay." And then he says, "Deliver it right to headquarters yourself." At that time, I did."

[2] Page 51, L. 1-20, Deposition of LaPier in *Vanessa Springer*.

separation to the County's Personnel Board through his counsel by letter dated June 26, 2009.

28. Shortly after this massive pattern of corruption was brought to the attention of Hylton, he appointed Morris to run the Police Academy. A short time after that appointment, Hylton ordered Morris to deliver to him the originals of all documents and student files for the classes at the Academy. Morris refused to provide the originals without a written receipt although he was willing to provide copies presumably because of his fear that this evidence would be destroyed. Hylton suspended Morris.

29. This suspension did not last long as shortly thereafter an Internal Affairs investigation was initiated on July 6, 2009 due to LaPier's complaint. Internal Affairs conducted an investigation and notified LaPier, by letter dated July 14, 2009 that many of the allegations that he had made about the conduct of his superior officers at the Academy for the time period October 27, 2008 through June 18, 2009 had been sustained. Thereafter, allegations of the massive cheating were reported in the Washington Post, the County Executive was indicted and the new acting County Executive fired Hylton. (A copy of the IAD letter is attached hereto as "Exhibit F")

30. LaPier alleges that his complaints uncovered a municipal policy and custom of allowing corruption at the Academy and of a policy of attempting to silence and discredit any employee who complains of or exposes these corrupt actions by government officials.

31. LaPier's appeal hearing of the MAB's decision and recommendation to Hylton that he terminate the employment of Plaintiff was heard by the County Personnel Board on May 19, 2010. The County was represented by legal counsel, as was LaPier. Major Morris testified on behalf of LaPier and confirmed the allegations as set forth in this Complaint.

32. The Rules of Administrative Procedure governing the Personnel Board conduct of such appeal hearings require the Board, after such hearing "to retire and its decision shall be issued by the Board within a reasonable period of time. LaPier, through counsel was notified by Carol Rubino, Personnel Board administrator that the Board had made a decision and that the proposed decision had been sent to the County's Law office for review.

33. In the months following LaPier's termination, Counsel for the County represented the Police Department and County at a mediation before the EEOC and despite making an

offer of settlement, subsequently failed to correspond or communicate with LaPier' Counsel regarding the offer or any aspect of this case.

34. It is the belief of LaPier that the Office of Law has refused to allow the decision by the Personnel Board to issue because it is detrimental to the defense of this case. LaPier, through Counsel, wrote to the newly appointed County Executive and the newly appointed County Attorney to alert them to this failure to render this decision providing due process of law to LaPier approximately two months ago. Counsel for LaPier has received no correspondence or other communication responding to or acknowledging LaPier's plea for intervention.

35. The County's failure and refusal to allow the Personnel Board's decision to issue constitutes a blatant denial of LaPier's right to due process. The County's actions constitute further evidence of a municipal policy and practice of unlawful discrimination and retaliation for speaking out about such discrimination and unlawful practices within the Police Department.

## COUNT I- VIOLATIONS 42 U.S.C. § 1983 FOR VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS

36. Paragraphs one through thirty-seven are hereby incorporated by reference as if fully set forth herein.

37. Pursuant to the First Amendment of the Constitution, Plaintiff has a right to discuss both as an employee and a citizen, matters of public concern. The Department's illegal practices involving cheating by instructors and other unlawful and discriminatory policies and practices at the Academy are matters of public concern.

38. Defendants violated Plaintiff's First Amendment Rights under color of county law by terminating him from his employment with the Department to silence him and in retaliation for voicing his complaints involving the unlawful and demeaning treatment of student officers and to prevent the discovery of widespread cheating and its resulting affects upon the MPTPC certification of student officers..

39. As a direct and proximate result of the actions of the Defendants, Plaintiff suffered monetary damages for lost wages, benefits as well as pain and suffering, loss of credit and other damages.

Wherefore, Plaintiff demands $500,000.00 for economic losses, pain and suffering, as against each Defendant jointly and severally and $1,000,000.00 in punitive damages against each of the individual Defendants as well as reasonable costs and attorneys fees.

## COUNT II- VIOLATION OF 42 U.SC. §1983 FOR DENIAL OF PROCEDURAL DUE PROCESS BY PERSONNEL BOARD AND OFFIC OF LAW

40. Paragraph one through thirty-seven are hereby incorporated by reference as if fully set forth herein.
41. Under the due process procedures for terminating the employment of a PG County employee, LaPier was entitled to a fair due process hearing resulting in the rendering of a decision by the County Personnel Board
42. The Defendant County, acting through the Office of Law and the County Personnel Board have failed and refused to grant LaPier his procedural due process right to such hearing and decision by the Board refusal to render its decision and by the Office of Law's failure and/or refusal to allow or permit the Personnel Board to issue or render its decision reached in the LaPier case
43. Such failure and refusal has not been explained or justified in any manner and appears to simply be an attempt by the County to further suppress speech and evidence to the County's policy in discriminating against individuals with perceived disabilities and evidence favorable to the Plaintiff in this matter.
44. As a direct and proximate result of the County's denial of LaPier's right to a due process hearing before the Personnel Board and of the Office of Law's involvement in attempting to permit the publication or issuance of a decision by the Board Plaintiff has been left without employment, deprived of salary and benefits and has endured pain, been denied a hearing and been denied evidence to be used in this matter that may prove to be dispositive thus suffering significant monetary losses for lost earnings, loss of his right to engage in his chosen career and damage to his reputation.

Wherefore, Plaintiff demands $1,000,000.00 for economic losses, pain and suffering, as against each Defendant jointly and severally and $2,000,000.00 in punitive damages against the

Defendants both jointly and severally as well as reasonable costs and attorneys fees.

### COUNT III-FOR VIOLATIONS OF THE REHABILITATION ACT OF 1973

45. Paragraphs one through thirty-eight are hereby incorporated by reference as if fully set forth herein.
46. The Rehab Act requires that "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. §794(a). The County and the Department receive Federal financial assistance.
47. The Plaintiff is able to perform the essential elements of the job of a Police Officer and as such, he is a qualified individual within the meaning of the Rehabilitation Act, 29 U.S.C. §794(a).
48. The Plaintiff produced reports and letters from two physicians stating that he was able to perform the functions of a student officer.
49. Despite being a qualified individual, and ignoring the medical evidence, the Department and Hylton separated the Plaintiff from his employment with the County in violation of the Rehab Act.
50. By terminating the Plaintiff, Defendants have discriminated against and excluded Plaintiff from employment because of his disability and continues to discriminate against him by employing standards that perpetuate and discriminate against qualified individuals.
51. By terminating the Plaintiff due to his disability, Defendants have violated the Rehab Act, and as a direct and proximate result of these unlawful practices and acts, Plaintiff has suffered monetary losses for loss wages and benefits, loss of credit and reputation, mental anguish and pain and suffering and other damages.

Wherefore, Plaintiff demands $500,000.00 for economic losses, pain and suffering, as against each Defendant jointly and severally and $1,000,000.00 in punitive damages against each Defendant as well as reasonable costs and attorneys fees.

### COUNT IV-FOR VIOLATIONS OF THE AMERICANS

## WITH DISABILITIES ACT AND THE AMERICANS WITH DISABILITIES AMENEDMENT ACT OF 2008

52. Paragraphs one through thirty-eight are hereby incorporated by reference as if fully set forth herein.

53. The ADA requires that "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individuals in regard to job application procedures, the hiring, advancement or discharge if employees..." 42 U.S.C. §12112(a).

54. Plaintiff was perceived by the Defendants to be suffering from, inter alia, Osler-Weber-Rendu Syndrome, a disease that can substantially limit one's major life activities.

55. Despite being perceived to be suffering from that handicap, the Plaintiff is able to perform the essential elements of the job of a Police Officer with an accommodation and as such, he is a qualified individual within the meaning of the ADA, 42 U.S.C. §12112 (a) and the ADAAA of 2008 and regulations 76 FR 16978 (March 25, 2011)

56. The Plaintiff produced reports and letters from two physicians stating that he was able to perform the functions of a student officer.

57. Despite being a qualified individual, and ignoring the medical evidence, the Department and Hylton separated the Plaintiff from his employment with the County in violation of the ADA.

58. By terminating the Plaintiff, Defendants have discriminated against and excluded Plaintiff from employment because of his disability and continues to discriminate against him by employing standards that perpetuate and discriminate against qualified individuals.

59. By terminating the Plaintiff due to his disability, Defendants have violated the ADA. As a direct and proximate result of these unlawful practices and acts, Plaintiff has suffered monetary losses for loss wages and benefits, loss of credit and reputation, mental anguish and pain and suffering and other damages.

Wherefore, Plaintiff demands $500,000.00 for economic losses, pain and suffering, as against each Defendant jointly and severally and $1,000,000.00 in punitive damages against each Defendant as well as reasonable costs and attorneys fees.

## PRAYER FOR A JURY TRIAL

**Plainiff herby demands a jury trial on all issues triable by jury.**

*/s/ John M. Singleton*
**JOHN M. SINGLETON, #02275**
**THE SINGLETON LAW GROUP**
**1447 York Road, Suite 508**
Lutherville, Maryland 21093
jsingleton@singleton-law.com
410-902-0073
Attorneys for Plaintiff